

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-21-00463-CV

**IN THE INTEREST OF M.M.**, J.M.M., and L.A.M., Children

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2020-PA-00974
Honorable John D. Gabriel, Jr., Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:        Luz Elena D. Chapa, Justice
                Irene Rios, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: April 13, 2022

AFFIRMED

Mother (A.M.) appeals the trial court's order terminating her parental rights to the children, challenging the trial court's predicate finding and best interest finding.[1]  We affirm.

### BACKGROUND

The Department received a referral against Mother for allegations of neglect, drug use, and homelessness in May 2020.  The three children who are the subject of this case are M.M., J.M.M., and L.A.M., who were fourteen years old, five years old, and three years old, respectively, at the time of the referral.  M.M. made the allegations after her parents left her and her younger brothers at the Boysville shelter so they could get back on their feet after losing their jobs and housing during the Covid-19 pandemic.  Specifically, M.M. alleged that her parents were using

---

[1] Father's parental rights were also terminated but he does not appeal.

methamphetamines, were violent with each other, and routinely left her alone with her younger brothers for days at a time. The Department removed the children from the parents' custody in May 2020.

A non-jury trial commenced via Zoom eleven months later on April 14, 2021. Because the evidence showed the Covid-19 pandemic had a severe effect on the parents, causing them to lose their jobs, housing, and phone service, the trial court extended the dismissal date of the case for six months. The trial court reset the trial to continue in two months to allow the parents an opportunity to re-engage and complete their services, provide drug tests showing they were not using drugs, and demonstrate their desire to get their children back. Trial continued on June 23, 2021. During the two-day trial, the court heard testimony from the Department caseworker, the CASA volunteer, and the foster-to-adopt mother, as well as from Mother and the children's father. At the conclusion of the evidence, the trial court terminated Mother's parental rights based on its findings that Mother failed to complete her court-ordered family service plan and termination was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O), (b)(2). The Department was appointed permanent managing conservator of the children. On appeal, Mother asserts the evidence is legally and factually insufficient to support the trial court's predicate finding under (O) and its best interest finding.

## STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a

reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id.*

### PREDICATE GROUND FOR TERMINATION

In her first issue, Mother argues the evidence was legally and factually insufficient to support the trial court's predicate finding that she failed to complete her court-ordered family service plan. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

Subsection (O) allows termination of a parent's rights if the trial court finds by clear and convincing evidence that the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship" of the Department "for not less than nine months as the result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *Id.* Mother asserts that she was "actively engaged" in the required services at the time of trial and the alleged incident of neglectful supervision that led to the children's removal was "a one-time unfortunate incident."

#### *Trial Evidence Regarding Mother's Service Plan*

The Department caseworker Eletheia Hill testified she was assigned to the case in May 2020. Mother's service plan required her to submit to a psychological evaluation and drug assessment, complete parenting classes, domestic violence classes, and individual counseling, and

comply with random drug testing. Mother was also required to obtain and maintain employment and a safe and stable home. Hill testified she went over the services on the plan with Mother in June 2020 and she understood the services. Hill also testified that Mother had prior CPS history and had previously worked family service plans.

As of the first day of trial on April 14, 2021, Mother had not completed any of the services on her plan. Hill testified Mother had "open referrals for drug and alcohol assessments since the start of the case in June [2020], resulting in three separate referrals; the most recent referral was March 31, 2021. Mother finally completed a drug assessment on April 12, 2021, two days before trial commenced, and was recommended to attend outpatient drug treatment. Mother had begun drug treatment the week of trial. In June, Hill testified that Mother told her she had used methamphetamine on April 13, 2021, the day before trial began.

Hill further testified that she requested drug testing throughout the case, but Mother never drug tested. In April, Hill stated she asked Mother to do a hair follicle test three weeks prior to trial during a meeting at which Mother's attorney was present; Mother failed to do the drug test. When the trial court continued the trial for two months, it explicitly instructed Mother that, "[a]ny drug tests that are requested, you need to comply immediately . . . [I] don't want to hear excuses two months down the road, talk to your attorney[] if you have any issues doing the necessary services." The trial court then ordered Mother to take a hair follicle drug test within one week. Hill testified she sent Mother for the hair follicle test the same day, but Mother failed to do the test and told Hill the facility was closed when she arrived. Hill stated she again sent Mother to do a hair follicle test on June 14, 2021, the week before trial continued. At trial in June, Mother testified she took the hair follicle test on the Friday before trial. Hill testified she had no test results and Mother had not told her she took the hair follicle test. Hill testified that drug testing and drug treatment were critical parts of Mother's service plan and were not completed. Hill testified at

both days of trial that she had ongoing concerns about Mother's pattern of methamphetamine use based on her failure to test, drug use as one of the reasons for removal in this case, and her prior CPS history.

In June, Mother testified she was engaged in drug treatment and acknowledged she has a drug problem and would for the rest of her life; she stated she was re-evaluated on Monday of that week and the treatment consists of twelve sessions. Mother stated Hill never requested a drug test until recently, but also stated Hill requested her to drug test three times during the case. Mother testified she took a drug test on July 27, 2020 and had a receipt; however, no receipt was offered or admitted. Mother also stated she had proof that the testing facility was closed when she attempted to test later in the case, but no proof was offered or admitted.

Hill testified in April that Mother was currently engaged in individual counseling. Mother had been referred to a counselor in late summer 2020 but was unsuccessfully discharged by the counselor. Mother testified the initial counselor had a "conflict of interest." After a seven-month gap, Mother re-engaged with a different counselor in mid-March 2021 and had attended three sessions as of trial on April 14, 2021. Hill testified Mother's lack of consistent engagement in counseling concerned her because Mother's behaviors during the seven-month gap and her parenting abilities were affected by the lack of counseling. Specifically, Hill observed that Mother is "easily agitated and argumentative" and has "issues engaging peacefully even with the children present." Hill stated that Mother's interactions with her have been "argumentative and unpeaceful at all times." Hill also testified that she monitored several of Mother's interactions with the children, phone calls on weekends and parent-child visits, and "intervened when needed." For example, on a weekend FaceTime call that Hill monitored, Mother got into an argument with M.M. about "why she was not doing what she was being asked to do" and Mother raised her voice at M.M. At the beginning of the case, Mother expressly requested individual counseling to address

issues with trauma in her life and family problems. Hill testified she had not observed any improvement in Mother's coping skills during the case. When trial continued in June, Hill and Mother testified that she was still engaged with her second counselor and had not yet been successfully discharged.

Hill testified in April that she was not aware that Mother was enrolled in parenting classes. Mother testified she had started attending parenting classes three weeks before. Her first attempt to engage in parenting classes was in July 2020, but she had no way to do virtual classes without a computer or phone service and no transportation. In June, Mother testified she had three more parenting classes to attend before completion.

In April, Hill testified she was concerned that Mother had not followed through on the referral to Family Violence Prevention Services because Mother alleged physical abuse by her husband at the beginning of the case. Mother also told Hill that she and her husband had physical fights in front of the children. When Mother testified in April, she denied that her husband physically strikes her, stating that was in the past. However, in June Mother admitted there has been domestic violence between her and her husband and they have "argued" in front of the children. Mother stated they have separated "on and off" during the last five years and are currently separated. Mother testified in June that she completed domestic violence classes and a certificate of completion was admitted into evidence.

With respect to income and a stable home, Hill testified Mother told her she lost her job at the beginning of the pandemic and could not find a new job, so she had no income and could not maintain housing and lost her phone service which resulted in a lack of communication with Hill. Hill stated she informed Mother she could come to the Department to use a computer there. Mother denied being told that. Hill also stated that Mother had a vehicle at the beginning of the case and lost it later during the case. Mother stated the car was repossessed the summer of 2020. Hill stated

the Department will provide transportation to parents when requested. Mother just needed to ask for help. Hill did not consider the pandemic the reason why Mother failed to complete her services.

At the end of her testimony in June, Hill testified the Department was still recommending termination of Mother's parental rights because the Department's concerns at the time of removal about Mother's methamphetamine use and lack of a stable home had "not been resolved in any way." Hill stated Mother had not drug tested and she had no drug test results to judge whether Mother was still using drugs. In addition, Mother still did not have a stable home and had not provided any proof of employment to Hill, although she stated she had a job. Mother had only completed one service on her plan (the domestic violence class), and had not provided Hill with any documentation to show what services she had recently done. Hill testified she had only seen "momentary" willingness by Mother to make positive personal changes. Hill was concerned that Mother was exhibiting the same on-going pattern and "there was nothing to demonstrate that any long-term change was on the horizon."

In sum, Mother explained that her lack of reliable cell phone service and transportation at the beginning of the case made it difficult to schedule and work her services. At the end of the first day of trial, the trial court expressed its concern that she did not have a full opportunity to comply with her service plan and provided Mother additional time to drug test and work her services by granting a two-month trial continuance. While Mother had made good progress on many of her services when trial resumed, Hill had still not received any drug test results. Given Mother's pattern of methamphetamine use in previous CPS cases and her complete failure to drug test during this entire case, the trial court could have believed that Mother's excuses were not credible and that she was still using methamphetamines, as she admitted doing right before trial began in April 2021. To the extent Mother claims she proved the defense available under section 161.001(d) by showing she made a good faith effort to complete her service plan and is not at fault

for failing to complete all the services, we disagree. *See* TEX. FAM. CODE ANN. § 161.001(d) (proof of defense must be by preponderance of the evidence). As the factfinder, the trial court was the sole judge of the witnesses' credibility and the weight of the evidence. Mother gave contradictory testimony about the number of times Hill asked her to drug test and claimed she had proof that she found the facility closed a couple of times and actually completed a hair follicle test in July 2020 and the Friday before trial resumed in June; however, no proof or results were offered or admitted. The trial court clearly stated how critical it was that Mother drug test "immediately" during the two-month continuance so drug test results would be available. Mother's failure to drug test is considered a positive test result under the law and supports an inference that she is still using drugs. *See In re C.J.Y.*, No. 04-20-00009-CV, 2020 WL 3441248, at *5 (Tex. App.—San Antonio June 24, 2020, pet. denied) (mem. op.); *see also In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.— Houston [14th Dist.] 2017, no pet.) (a fact finder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs). A parent must complete all of the services on their plan to be in compliance and the failure to complete just one requirement supports a predicate finding under subsection (O). *In re J.S.G.*, No. 04-18-00476-CV, 2019 WL 113736, at *3 (Tex. App.—San Antonio Jan. 7, 2019, no pet.) (mem. op.); *In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). We conclude the evidence is legally and factually sufficient to support the trial court's finding under subsection (O) that Mother failed to complete her service plan. *See* TEX. FAM. CODE ANN. § 161.001(b)(1) (O).

## CHILDREN'S BEST INTEREST

Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the

factors set out in section 263.307 of the Family Code should be considered. *See* TEX. FAM. CODE ANN. § 263.307(b).[2] In addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[3] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In determining whether termination of the parent–child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). The predicate grounds for termination may also be probative of best interest. *In re C.H.*, 89 S.W.3d at 28.

---

[2] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[3] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371–72).

### *Mother's Pattern of Continued Drug Use*

As discussed at length above, despite repeated requests, Mother failed to drug test during this case and such refusals are considered positive results. *In re C.J.Y.*, 2020 WL 3441248, at *5; *In re E.R.W.*, 528 S.W.3d at 265 (fact finder can reasonably infer parent's failure to drug test indicates use of illegal drugs). Further, the evidence showed Mother has used methamphetamine over a long period of time, leading to prior CPS cases and repeated removals of older children as well as the three children in this case. Mother conceded at trial that she has a history of prior CPS cases, but stated she always got her children back. Mother had a CPS history in California before she moved to Texas. In California, she was investigated for methamphetamine use in 2000 and in 2002 when her son I.M. was born positive for methamphetamine. Mother's first CPS investigation in Texas was in 2013. In 2015, M.M. went into CPS care based on accusations by school officials but Mother did not know the subject of the accusations. In 2017, the children went into CPS care because Mother had no stable place to live. In the current case, Hill stated the Department became involved and removed the children in May 2020 due in part to M.M.'s allegations of Mother's continuing drug use. Hill testified this was the third time the children had been removed from their parents in Texas; they were returned to the parents the other two times. The pattern of the children coming in and out of the Department's care concerned Hill because of the lack of stability, their exposure to the parents' drug use and the parents' inability to take accountability and address their drug use. As of the June trial date, Mother had not successfully completed drug treatment. She did acknowledge having a drug problem and agreed she will have to deal with her addiction for the rest of her life. Hill testified the Department's initial concerns about Mother's methamphetamine use still existed at the end of the case and supported termination as being in the children's best interest.

A trial court may judge a parent's future conduct by his or her past conduct in determining whether termination is in the child's best interest. *In re E.D.*, 419 S.W.3d at 620. Based on the evidence of Mother's methamphetamine use before and during the case, including her failure to drug test during the case, the trial court could have concluded that Mother's struggle with continued drug use weighed in favor of termination being in the children's best interest.

### Children's Needs and Desires

At the time of trial, M.M. was 15 years old, J.M.M. was six years old, and L.A.M. was five years old. As of April 2021, the two boys, J.M.M. and L.A.M., were placed with a foster family and M.M. was still at Boysville. When trial continued in June, M.M. had joined the boys in the foster placement.

Hill testified that both boys have "emotional behaviors" and are being assessed for autism spectrum disorder, emotional disturbance disorders, and have "big tantrums." J.M.M. is taking ADHD medications. Both boys take melatonin for sleeplessness. According to Hill, when L.A.M. gets upset he is not able to express himself so he gets "physically active" with his brother. L.A.M. has tantrums that last up to an hour if he does not understand what is happening or why something is changing; he needs time to adjust to change. J.M.M. is "more emotional and can be withdrawn." Both boys get overwhelmed easily and are struggling a bit in school. Both boys have indicated to Hill that they like the foster parents and in Hill's opinion it is a "really good option" for them because the home is stable, both parents work, and they have a long history of fostering and have been very consistent. Both boys need a stable daily routine for their emotional stability and educational stability.

Hill testified M.M. missed a lot of the last school year before coming into the Department's care and is still failing most of her courses with the exception of math for which she has accepted tutoring. When classrooms went virtual during the Covid pandemic, M.M.'s parents did not have

access to allow her to participate in virtual classes. M.M. has dyslexia and is receiving tutoring to assist her. M.M.'s desire is to be placed with her adult sister C.M. and, if that is not possible, she would like to join her brothers in the foster home. The three children are bonded to each other and it is important that M.M. maintain contact with her brothers, at a minimum. Hill testified she visited the home at which C.M. was staying and informed her of the Department's safety concerns and the changes she needed to make to pass a home study. By the June trial date, C.M. had not made the necessary changes and was not a qualified placement option for M.M. By the June trial date, all three children were placed with the foster parents who want to adopt all the children. Hill testified that all three children were bonded to the foster family; M.M. had been visiting on the weekends prior to her placement there.

CASA volunteer Sally Valenzuela testified that she and her husband were assigned to the case in June 2020. They had multiple calls and virtual visits with the children during the case and in-person visits in the last few months. J.M.M. did not attend preschool and may need to repeat kindergarten. Both boys need strong support for attending school regularly and for academic support outside the school setting. M.M. needs educational support and support for her social development during her teen years. M.M. skips school consistently and has failing grades although she is smart. She has dyslexia and accommodations are in place at school, but she does not complete her assignments. M.M. "needs support in her social interactions and in understanding what's appropriate and not appropriate in relationships with peers as well as adults and in making good decisions as she moves toward being an independent young woman." M.M. told her that she would be "very excited" to be in a foster home with her brothers.

### Ability of Proposed Placement to meet Children's Needs and Permanency Plan

Hill stated the Department's permanency goal is parental termination and adoption of all three children by the foster parents. The foster parents are able to meet the children's emotional,

physical, and educational needs and the home provides a safe, stable environment. Hill testified the foster parents began with weekend visits with the boys, and progressed to overnights, for the six weeks leading up to the April trial date. The foster parents are fully aware of the boys' behavioral and educational needs. Before M.M. was placed there in June, the foster parents picked up M.M. from Boysville for consistent visits with her brothers. M.M. takes on a mothering role as nurturer and disciplinarian with the boys during the visits. As of June, all the children were bonded with the foster parents. Hill testified that, based on her observations of virtual and in-person visits between the children and Mother, she could not say the children are strongly bonded with Mother. In Hill's opinion, termination of Mother's parental rights and adoption by the foster parents was in all the children's best interests.

Nicole Scallia, the foster mother, testified and confirmed that she and her husband want to adopt all three children as a "sibling group." She and her husband work full-time, have a nice home, and can provide the children with a safe, drug-free, and stable home environment. They understand the children's physical, emotional, and educational needs and are able to meet them. Scallia stated she has been facilitating contact between the children and their adult sibling C.M., with whom they are very close. She also facilitates phone contact with their other adult siblings who reside outside Texas. Scallia testified that the children are "really attached to us." The boys are very affectionate with them. M.M. feels comfortable and happy in the home; she has been visiting them since early May 2021.

### *Mother's Parental Abilities to Meet the Children's Needs*

Hill agreed the parents voluntarily placed the children at Boysville because they recognized they needed to "get back on their feet." However, Hill stated that Mother had failed to show a consistent willingness to make positive personal changes during the course of the case.

Mother was "in and out of homelessness" during the case and had not established stability by the end of trial. Mother most recently told Hill she was living with a friend but Hill had no specific information. At the beginning of the case, Mother visited the children consistently each week along with the father. However, in July 2020 the parents had an argument and asked for their visits to be separated; they visited separately for a month and then neither parent visited or contacted Hill for three months. Hill learned in September 2020 that Mother had gone to California for a "family emergency;" she returned in October and had two virtual visits before becoming consistent again in February or March 2021 when in-person visits started. Hill observed all the virtual visits and the in-person visits between Mother and the children and did not observe a strong bond between them. Hill opined that it is in the children's best interest for Mother's parental rights to be terminated because Mother has continued with a well-documented pattern of behavior leading to the children's repeated removals, has not addressed the issues that led to the removals, and has not demonstrated any ability to care for the children now or in the future or established any stability for the children. In Hill's opinion, Mother has not demonstrated a willingness to put the children's needs before her own.

Valenzuela, the CASA volunteer, also testified that termination of Mother's parental rights was in the children's best interest because there is nothing to show Mother can provide a permanent home for the children and the boys in particular "need strong parenting with regard to their behavior and their success in school;" it does not appear Mother is able to provide that. Valenzuela had concerns about Mother's parental abilities because she has heard Mother make statements about her feelings and her desire to have the children with her, but the statements were not focused on the children's safety or support or what is in the children's best interests.

Finally, Mother testified she believed she was doing the right thing by leaving the children at Boysville while she got back on her feet. Mother testified that she does understand the risk to

her children posed by her drug addiction and it is something she will have to address throughout her life. Mother stated her belief that the children are strongly bonded to her and to each other and expressed her desire to get her children back. However, Mother conceded at the end of trial that she was "not completely ready" to have the children placed with her because she still needed to get her own home; she was currently renting a room in a house. She estimated she would be ready in two to three months because she now has a full-time job, consistent phone service, and a car. Mother stated she was employed at O'Reilly Auto Parts store. Mother requested more time from the trial court in April and again in June so that she could establish a stable home to provide for the children. Mother alternatively requested that the children be placed with C.M. once she could pass a home study. Mother admitted she missed some virtual and in-person visits with the children during the case due to lack of phone service and/or transportation, but stated she attended all the visits she could.

Having reviewed the record and considered all the evidence with respect to the relevant factors under the appropriate standards, we conclude the trial court could have reasonably formed a firm belief that termination of Mother's parental rights was in the best interest of all the children. *See In re J.O.A.*, 283 S.W.3d at 344-45; *In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied) ("When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent.").

## CONCLUSION

Based on the foregoing reasons, we affirm the trial court's order terminating Mother's parental rights to the children.

Liza A. Rodriguez, Justice